IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-21

 No. 3A21

 Filed 11 March 2022

 IN THE MATTER OF FRANK LENNANE, Petitioner

 ADT, LLC, Employer

 and

 NORTH CAROLINA DEPARTMENT OF COMMERCE, DIVISION OF
 EMPLOYMENT SECURITY, Respondent

 Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of

 the Court of Appeals, 274 N.C. App. 367 (2020), affirming an order entered on

 17 February 2020 by Judge W. Robert Bell in Superior Court, Haywood County.

 Heard in the Supreme Court on 6 January 2022.

 Legal Aid of North Carolina, Inc., by Joseph Franklin Chilton, Cindy M.
 Patton, John R. Keller, and Celia Pistolis, for petitioner-appellant.

 North Carolina Department of Commerce, Division of Employment Security, by
 Elias W. Admassu, R. Glen Peterson, and Sharon A. Johnston, for respondent-
 appellee.

 BARRINGER, Justice.

¶1 In this case, we consider whether to uphold the determination that petitioner

 Frank Lennane is disqualified from receiving unemployment benefits. To guide the

 interpretation and application of unemployment benefits under Chapter 96 of the

 General Statutes of North Carolina, the legislature has declared the public policy of
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 this State for nearly ninety years as the following:

 Economic insecurity due to unemployment is a serious
 menace to the health, morals, and welfare of the people of
 this State. Involuntary unemployment is therefore a
 subject of general interest and concern which requires
 appropriate action by the Legislature to prevent its spread
 and to lighten its burden which now so often falls with
 crushing force upon the unemployed worker and his family.
 The achievement of social security requires protection
 against this greatest hazard of our economic life. This can
 be provided by encouraging employers to provide more
 stable employment and by the systematic accumulation of
 funds during periods of employment to provide benefits for
 periods of unemployment, thus maintaining purchasing
 power and limiting the serious social consequences of poor
 relief assistance. The Legislature, therefore, declares that
 in its considered judgment the public good and the general
 welfare of the citizens of this State require the enactment
 of this measure, under the police powers of the State, for
 the compulsory setting aside of unemployment reserves to
 be used for the benefit of persons unemployed through no
 fault of their own.

 Unemployment Compensation Law, ch. 1, sec. 2, 1936 N.C. Pub. [Sess.] Laws (Extra

 Sess. 1936) 1, 1 (codified at N.C.G.S. § 96-2 (2021)).

¶2 This declaration guides our analysis of the issue before us: whether Lennane’s

 leaving work was attributable to his employer as required by N.C.G.S. § 96-14.5(a) to

 avoid disqualification for unemployment benefits. See N.C.G.S. § 96-2. Having

 considered the legislature’s declared public policy, the plain language of the

 applicable statute, and the binding findings of fact, we conclude that Lennane failed

 to show that his leaving work was attributable to his employer as required by
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 N.C.G.S. § 96-14.5(a).

 I. Background

¶3 Lennane left work on 16 November 2018. Lennane filed an initial claim for

 unemployment benefits on 11 November 2018. An adjudicator held Lennane

 disqualified for benefits, and Lennane appealed. Thereafter, an appeals referee

 conducted a hearing on the matter. The appeals referee affirmed the prior decision

 and ruled that Lennane was disqualified for unemployment benefits because he failed

 to show good cause attributable to the employer for leaving as required by N.C.G.S.

 § 96-14.5(a). Lennane then appealed to the Board of Review for the North Carolina

 Department of Commerce. The Board of Review adopted the appeals referee’s

 findings of fact as its own and concluded that the appeals referee’s decision was in

 accord with the law and the facts. Accordingly, the Board of Review affirmed the

 appeals referee’s decision. Lennane next appealed to the superior court, which

 affirmed the Board of Review’s decision. Lennane then appealed to the Court of

 Appeals.

¶4 A divided panel of the Court of Appeals affirmed the superior court’s order. In

 re Lennane, 274 N.C. App. 367, 372 (2020). When considering whether the superior

 court erred by affirming the Board of Review’s determination, the Court of Appeals

 compared this case with the Court of Appeals decision in Ray v. Broyhill Furniture

 Industries, 81 N.C. App. 586 (1986). In re Lennane, 274 N.C. App. at 370. In Ray, the
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 Court of Appeals “held that the claimant proved her reason for leaving was

 attributable both to the employer’s action (the threat to fire her if she went over her

 supervisor’s head) and inaction (her supervisor’s failure to put in her transfer

 request).” Id. (cleaned up). Unlike Ray, the Court of Appeals explained that, in this

 case, the employer acted to help Lennane. Id.

¶5 The Court of Appeals then considered whether competent evidence supported

 the challenged findings of fact and whether those findings of fact supported the

 conclusion of law. Id. at 370–72. The Court of Appeals concluded that competent

 evidence supported the challenged findings of fact and that the findings of fact

 supported the conclusion that Lennane “failed to establish that his good cause for

 leaving work was attributable to the employer.” Id. at 372 (cleaned up).

¶6 To the contrary, the dissent contended that:

 It is not [Lennane]’s fault that his knee suffers from
 osteoarthritis, nor is it his fault that his employer’s
 “business needs” precluded accommodations that would
 not require him to sacrifice his health. He was thus
 rendered “unemployed through no fault of [his] own[,]”
 N.C. Gen. Stat. § 96-2.

 Id. at 373 (Inman, J., dissenting) (second and third alterations in original).

¶7 According to the dissent, like in Ray, Lennane’s employer’s inaction “placed

 [him] in the untenable position of having to choose between leaving [his] job and

 becoming unemployed or remaining in a job which . . . exacerbated [his medical]

 conditions.” Id. (alterations in original) (quoting Ray, 81 N.C. App. at 592–93). Thus,
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 the dissent, relying on N.C.G.S. § 96-2 and Ray, would have held that Lennane left

 work for good cause attributable to the employer. Id. The dissent disagreed with the

 majority’s conclusion of law but did not identify any findings of fact as being

 unsupported by competent evidence. Id. at 372–73.

¶8 Lennane appealed based on the dissenting opinion. Accordingly, we now

 consider the issue Lennane identified as distinguishing the majority and dissenting

 opinions: “whether his leaving was attributable to the employer.”

 II. Standard of Review

¶9 “The standard of review in appeals from the [Department of Commerce,

 Division of Employment Security], both to the superior court and to the appellate

 division, is established by statute.” Binney v. Banner Therapy Prods., Inc., 362 N.C.

 310, 315 (2008). In these judicial proceedings, “the findings of fact by the Division, if

 there is any competent evidence to support them and in the absence of fraud, shall be

 conclusive, and the jurisdiction of the court shall be confined to questions of law.”

 N.C.G.S. § 96-15(i) (2021); see also N.C.G.S. § 96-15(h) (establishing procedure for

 judicial review of a decision of the Board of Review); Binney, 362 N.C. at 315. When

 no challenge to a finding of fact is made, an appellate court presumes that the finding

 of fact is supported by the evidence, and the finding of fact is binding on appeal. See,

 e.g., Carolina Power & Light Co. v. Emp. Sec. Comm’n of N.C., 363 N.C. 562, 564

 (2009); State ex rel. Emp. Sec. Comm’n v. Jarrell, 231 N.C. 381, 384 (1950). We review
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 de novo whether the Division’s findings of fact support the conclusions of law.

 Carolina Power, 363 N.C. at 564.

 III. Analysis

¶ 10 Article 2C of Chapter 96 of the North Carolina General Statutes sets forth

 when benefits are payable for unemployment and when an individual is disqualified

 from receiving benefits. N.C.G.S. §§ 96-14.1 to -14.16 (2021). As relevant to this

 appeal, subsection 96-14.5(a) mandates that “[a]n individual does not have a right to

 benefits and is disqualified from receiving benefits if the Division determines that the

 individual left work for a reason other than good cause attributable to the employer.”

 N.C.G.S. § 96-14.5(a). “When an individual leaves work, the burden of showing good

 cause attributable to the employer rests on the individual and the burden may not be

 shifted to the employer.” N.C.G.S. § 96-14.5(a). Good cause exists when an

 individual’s “reason for [leaving] would be deemed by reasonable men and women

 valid and not indicative of an unwillingness to work.” In re Watson, 273 N.C. 629, 635

 (1968). “A separation is attributable to the employer if it was produced, caused,

 created or as a result of actions by the employer.” Carolina Power, 363 N.C. at 565

 (cleaned up).

¶ 11 Since the Division conceded on appeal that Lennane had good cause to leave

 work, the only question before us is whether the findings of fact support the

 conclusion of law that Lennane’s leaving work was not attributable to his employer.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 See N.C.G.S. § 96-14.5(a). We cannot, as the Court of Appeals’ dissent did, substitute

 our view of the evidence for the findings of fact before us. See In re Lennane, 274 N.C.

 App. at 373 (Inman, J., dissenting) (acknowledging the findings of fact concerning the

 employer’s attempt to make accommodations but dismissing them based on the

 dissent’s interpretation of the manager’s testimony and making its own findings

 concerning the detriment to Lennane’s health from performing the equipment

 installations, Lennane’s ability to perform the number of installations required of

 him by his employer, and Lennane’s fault).

¶ 12 All findings of fact by the Division are as follows:

 1. The claimant filed an initial claim for unemployment
 insurance benefits on November 11, 2018.

 2. The claimant last worked for ADT LLC on November
 16, 2018 as a service technician.

 3. The Adjudicator issued a determination under Issue
 No. 1669952 holding the claimant disqualified for
 benefits. The claimant appealed. Pursuant to
 [N.C.]G.S. [§] 96-15(c), this matter came before
 Appeals Referee Stephen McCracken on August 7,
 2019. Present for the hearing: Frank Lennane,
 claimant; Joseph Chilton, claimant representative;
 Randall Goodson, employer witness and
 installation/service manager; Stephanie Morgan,
 employer witness and administrative team leader;
 Michael Curtis, employer representative. The
 employer’s representative participated in the hearing
 via teleconference following a written request to
 participate by telephone due to a travel distance of
 more than 40 miles to the hearing location. Neither
 parties were prejudiced by the hybrid hearing.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

4. The claimant was employed by the above-captioned
 employer from February 1, 2012 until November 16,
 2018.

5. As a service technician for the employer, the claimant
 conducted service calls to the employer’s residential
 and commercial customers with security or business
 alarm systems. Generally, service calls only require a
 part/component replacement and, generally, do not
 require a significant amount of physical activity.
 Although, a service call sometimes required some
 ladder climbing and crawling.

6. At times, the claimant had to perform residential and
 commercial security system and alarm system
 installations. Installations require more physical
 work, such as more drilling, climbing, and crawling,
 than a service call.

7. The claimant was aware of his job duties and
 responsibilities and was trained to perform both
 service calls and installation jobs.

8. In 2014, the claimant injured his left knee while on
 the job. Said injury caused the claimant to undergo
 surgery. Following the claimant’s surgery, the
 claimant began to favor his right knee, which resulted
 in the claimant experiencing regular pain in his right
 knee. The claimant had a permanent partial disability
 in his left knee.

9. The claimant kept the employer informed of his
 physical health conditions.

10. In 2016, service technicians began to perform
 installation jobs following a business merger and a
 merger of the employer’s service and installation
 departments.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

11. The claimant had difficulty performing installations
 due to the poor physical conditions of his knees, of
 which he notified his manager. The claimant asked
 his manager if there were other jobs, such as
 administrative or clerical work, that in which [sic] he
 could apply for or be placed.

12. The employer only had administrative positions in
 Spartanburg, South Carolina and Knoxville,
 Tennessee, and the claimant was unwilling to relocate
 from North Carolina.

13. In 2017, the claimant took a [five] week leave of
 absence via the Family and Medical Leave Act
 (FMLA) to rest his knees and seek additional medical
 intervention.

14. On or about September 5, 2017, the claimant returned
 to work from his medical leave. The claimant’s doctor
 requested that the claimant not stand or walk for
 prolonged periods.

15. The claimant asked his manager, Randall Goodson, if
 he could only be assigned service calls due to the less
 strenuous nature of those jobs. The claimant’s
 manager denied the claimant’s request because he
 needed to keep a fair balance of work distribution
 among all of the service technicians.

16. However, the claimant’s manager made attempts
 thereafter to not dispatch the claimant on the most
 strenuous or large installations.

17. If the claimant had to be dispatched on a large
 installation, then manager Goodson would try to
 ensure that he (claimant) had another service
 technician available to assist him.

18. In October 2018, the claimant had an appointment
 with a surgeon to discuss treatment for his knees. At
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 which time, the claimant was told that he could
 undergo surgery or stem cell therapy. The claimant
 was unwilling to undergo either options [sic].

 19. As of November 2018, the claimant was continuing to
 fully perform his service technician job duties and
 responsibilities.

 20. On or about November 8, 2018, the claimant notified
 the employer that he was resigning from employment
 because he was no longer able to perform his job due
 to the physical health condition of his knees.

 21. Prior to the claimant’s resignation, he did not make
 any formal or written requests for workplace
 accommodations from either the employer’s
 administrative or human resources staff members.
 During 2018, the claimant did not request
 intermittent leave via FMLA.

 22. The claimant left this job due to personal health or
 medical reasons.

 23. At the time the claimant left, the employer did have
 continuing service technician work available for him.

¶ 13 Lennane argues that the findings of fact show that the employer’s actions and

 inactions, not those of Lennane, caused him to leave work to protect his health.

 According to Lennane, the findings of fact show that his employer acted by changing

 his job duties by increasing the amount of installation work required for his position

 and failed to act by not implementing his request to only be assigned service calls.

 Lennane, like the dissent, advances the proposition that “Ray [c]ompels [a]

 [c]onclusion” that Lennane left work with good cause attributable to the employer.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 Lennane also contends that his unwillingness to relocate for an administrative

 position with his employer cannot support the conclusion of law that he left work

 without good cause attributable to the employer and relies on the Court of Appeals’

 decision in Watson v. Employment Security Commission of North Carolina, 111 N.C.

 App. 410 (1993).

¶ 14 Admittedly, Lennane’s employer modified the allocation of installation jobs to

 service technicians two years before Lennane left work, and Lennane had difficulty

 performing installations because of pain in his knees. However, the findings of fact

 do not support the causal link required by N.C.G.S. § 96.14.5(a) between the

 employer’s action (change in allocation of installation work) or inaction (not ceding to

 Lennane’s request) and Lennane’s leaving.

¶ 15 Lennane has not shown that his allocation of installation jobs as modified by

 his employer in 2016 was more detrimental to his health than his prior duties and

 responsibilities. Before 2016, Lennane performed service calls as well as installations

 at times. Lennane’s partial disability in his left knee and pain in his right knee

 predated the 2016 modification. In 2016, only the allocation of service calls and

 installations assigned to service technicians, like Lennane, changed. Although

 installations involved “more physical work, such as more drilling, climbing, and

 crawling, than a service call,” Lennane’s “doctor requested that [Lennane] not stand

 or walk for prolonged periods.” There is no finding that the installations increased
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 the amount of prolonged standing and walking by Lennane relative to service calls.

 See In re Lennane, 274 N.C. App. at 370 (“[Lennane] provided no medical restrictions

 or limitations on bending, stooping, or crawling to [the e]mployer. The only medical

 request [Lennane] gave [the e]mployer was in September 2017 that he not stand or

 walk for prolonged periods.”). Thus, we cannot conclude that the employer’s action

 caused Lennane’s leaving.

¶ 16 Despite our sympathy for those with health conditions, we cannot fill in the

 facts for Lennane. We only have the binding findings of facts properly before us, and

 the burden is on Lennane pursuant to N.C.G.S. § 96-14.5(a) to show good cause

 attributable to the employer. We also do not rely on Barnes v. Singer Co., 324 N.C.

 213 (1989). In Barnes, this Court imposed the burden on the employer and declined

 to address whether there was good cause attributable to the employer. Id. at 216, 217;

 see also id. at 219 (Meyer, J., dissenting) (“The burden should be upon the party who

 is in the best position to prove the matter in question. Here, it is the claimant who

 can best prove the crucial fact, not yet established in this case, that transportation to

 the new plant site is, in a practical sense, unavailable to her.”).

¶ 17 Our legislature expressly placed on the individual the burden—that cannot be

 shifted to an employer—to show good cause attributable to the employer when the

 individual left work. See N.C.G.S. § 96-14.5(a). The goal sought by unemployment

 insurance is to avoid economic insecurity from involuntary unemployment. See
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 N.C.G.S. § 96-2. The legislature for nearly ninety years has recognized that this

 achievement “can be provided by encouraging employers to provide more stable

 employment and by the systematic accumulation of funds during periods of

 employment to provide benefits for periods of unemployment.” Id. Given the

 requirement of attribution to the employer under N.C.G.S. § 96-14.5(a), we must

 consider both an individual’s and employer’s efforts to preserve the employment

 relationship when assessing whether the individual’s leaving is attributable to the

 employer. Consideration of these efforts is consistent also with the legislative

 purposes of “encouraging employers to provide more stable employment” and

 “prevent[ing] [the] spread [of involuntary unemployment.]” N.C.G.S. § 96-2. If we

 ignore the efforts of employer in the binding findings of fact, like the dissent,

 employers are not encouraged to provide stable employment. Likewise, if we ignore

 the efforts of the employed individual, employers are not encouraged to provide stable

 employment. Thus, we review the findings of fact concerning both Lennane’s and his

 employer’s efforts to preserve the employment relationship.

¶ 18 Here, Lennane made some efforts to preserve his employment. He “kept [his]

 employer informed of his physical health conditions,” “notified his manager” that he

 “had difficulty performing installations due to the poor physical condition of his

 knees,” and his doctor in 2017 “requested that [Lennane] not stand or walk for

 prolonged periods.” He “asked his manager if there were other jobs, such as
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 administrative or clerical work, that . . . he could apply for or be placed.” In 2017, he

 “took a [five] week leave of absence via the Family and Medical Leave Act . . . to rest

 his knees and seek additional medical intervention.” He also “asked his manager,

 Randall Goodson, if he could only be assigned service calls due to the less strenuous

 nature of those jobs.”

¶ 19 In response to Lennane’s efforts, the employer made efforts to preserve the

 employment relationship. Lennane’s manager “made attempts [after Lennane’s

 request] to not dispatch [Lennane] on the most strenuous or large installations” and

 “would try to ensure that [Lennane] had another service technician available to assist

 him.” The employer also “had administrative positions in Spartanburg, South

 Carolina and Knoxville, Tennessee,” but not in North Carolina.

¶ 20 Ultimately, Lennane was unwilling to relocate from North Carolina for an

 administrative position and did not take additional Family and Medical Leave to

 treat his knees. Lennane subsequently resigned, working his last day on

 16 November 2018.

¶ 21 Given the foregoing, his employer acted to preserve the employment

 relationship. The employer, at Lennane’s request, provided Lennane the option to

 take an administrative position where the employer had administrative positions.

 The employer further made attempts to adjust the assignment of installations to be

 more favorable to Lennane given Lennane’s request. Lennane also had choices other
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 than leaving his employment—choices he did not take. Lennane could have relocated

 from North Carolina for an administrative position with his employer, an option

 provided by his employer at his request, or he could have taken additional Family

 and Medical Leave to treat his knees as his employer previously supported. Prior to

 his leaving, Lennane also had continued to fully perform his duties and

 responsibilities.

¶ 22 For these reasons, Ray is easily distinguishable from this case. In Ray, the

 employer did not act to preserve the employment relationship: the supervisor refused

 the employee Ray’s request to transfer to another department, denied her request for

 a protective mask, and threatened to terminate her employment if she conveyed her

 requests to the plant manager. 81 N.C. App. at 588. It is also “axiomatic that this

 Court is not bound by precedent of our Court of Appeals.” In re L.R.L.B., 377 N.C.

 311, 2021-NCSC-49, ¶ 31 (cleaned up). Thus, we neither endorse nor dismiss Ray.

¶ 23 The Court of Appeals’ decision in Watson v. Employment Security Commission

 of North Carolina is also not binding on this Court and is distinguishable. Unlike

 Watson, the employer in this matter did not relocate, and Lennane did not leave work

 because of unreliable transportation to work. See 111 N.C. App. at 415. Also, unlike

 this matter, the binding findings of fact in Watson reflected substantial attempts by

 the employee, Watson, to maintain the employment relationship. She expressed her

 concern to her employer about reliable transportation to and from work before the
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 relocation; she obtained some transportation from her supervisor; she used her own

 car until it broke down; and she made a series of other arrangements to get to work.

 See id. at 412. Watson did not leave work until she arrived late to work on account of

 her co-worker’s truck being in disrepair, was sent home as a penalty for arriving late,

 believed the truck beyond repair, and had no other foreseeable means of

 transportation to and from work every day of her work week. Id. at 412. As a result,

 the Court of Appeals concluded that “[a]ll of the Commission’s findings of fact make

 clear that petitioner desired, and attempted, to continue to work for respondent

 employer,” such that “[h]er leaving work was solely the result [of the relocation of the

 plant by her employer].” Id. at 415. Given the binding findings of fact before us, we

 cannot conclude the same in this matter. Thus, we neither endorse nor dismiss

 Watson v. Employment Security Commission of North Carolina but conclude that it

 is not analogous to this case.1

¶ 24 Although Lennane left work for good cause as conceded by the Division, the

 legislature created unemployment insurance for a more limited subset of individuals:

 those who left work for “good cause attributable to the employer.” N.C.G.S. § 96-

 14.5(a). Here, the employer made available to Lennane an administrative position as

 1 The dissent acknowledges that assessing attribution to the employer is highly fact-

 specific and relies on other cases that are factual distinct from the matter before us. Thus,
 further discussion of these cases from our lower courts would offer little (if any) additional
 clarity to our decision here.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 Lennane specifically requested. The employer offered positions in all the locales

 where the employer had such positions. The employer, thus, acted. Lennane still left,

 but his employer’s inaction did not cause Lennane’s leaving. Lennane had made other

 requests to his employer, but an employer need not cede to every request of an

 individual employed by the employer to avoid having his inaction deemed the cause

 of an individual’s leaving.

¶ 25 This Court’s holding honors the limitation created by our legislature on

 unemployment benefits, consistent with the plain language of the statute and the

 legislature’s express purpose of “encouraging employers to provide more stable

 employment” to prevent the spread of involuntary unemployment. N.C.G.S. § 96-2.

 “[T]he actual words of the legislature are the clearest manifestation of its intent, [so]

 we give every word of the statute effect, presuming that the legislature carefully

 chose each word used.” N.C. Dep’t of Corr. v. N.C. Med. Bd., 363 N.C. 189, 201 (2009).

 This Court in In re Watson explained:

 In [N.C.]G.S. [§] 96-14(1) it is provided that one is
 disqualified from receiving benefits under the act if he left
 work voluntarily “without good cause attributable to the
 employer.” The disqualification imposed in [N.C.]G.S.
 [§] 96-14(3) for failure to accept suitable work “without
 good cause” does not carry the qualifying phrase
 “attributable to the employer.” It cannot be presumed that
 the omission of these qualifying words was an oversight on
 the part of the Legislature. Thus, the “good cause” for
 rejection of tendered employment need not be a cause
 attributable to the employer.
 IN RE LENNANE

 2022-NCSC-21

 Opinion of the Court

 273 N.C. at 635.

¶ 26 Decades later, the legislature still does not omit the statutory language

 “attributable to the employer” for individuals leaving work: “[a]n individual is

 disqualified for any remaining benefits if the Division determines that the individual

 has failed, without good cause, to . . . [a]ccept suitable work when offered,” N.C.G.S.

 § 96-14.11(b), but “disqualified from receiving benefits if the Division determines that

 the individual left work for a reason other than good cause attributable to the

 employer,” N.C.G.S.§ 96-14.5(a) (emphasis added). Thus, we decline to create

 insurance paid for by employers for unemployment not attributable to an employer’s

 actions or inactions.

 IV. Conclusion

¶ 27 Unemployment insurance does not provide benefits to individuals who “left

 work for a reason other than good cause attributable to the employer.” N.C.G.S. § 96-

 14.5(a). While Lennane, as conceded by the parties, left work for good cause, he has

 failed to satisfy his burden to show that his leaving work was “attributable to the

 employer” as a matter of law. Id. Accordingly, we affirm the Court of Appeals’

 decision.

 AFFIRMED.
 Justice EARLS dissenting.

¶ 28 Both Mr. Lennane and the Employment Security Division agreed that Mr.

 Lennane’s reason for leaving his job, after having worked for ADT as a service

 technician for over six and a half years, was for “good cause” as defined by law.

 Indeed, respondent acknowledged to the court below that “[t]he Petitioner’s reason

 for resigning was the personal knee issues, and the Division’s Findings of Fact

 support the conclusion it was for ‘good cause.’ ” Where, as the dissent below noted,

 “[r]espondent concedes [petitioner] had good cause to resign,” In re Lennane, 274 N.C.

 App. 367, 373 (2020) (Inman, J., dissenting), the only issue for this Court is whether

 Mr. Lennane has met his burden of establishing that the good cause was attributable

 to his employer. Here the majority observes that the Division conceded good cause,

 but then illogically concludes that Mr. Lennane failed to establish a “casual link” to

 explain why he left work. The majority then imposes a newly crafted “efforts to

 preserve the employment relationship” test and infers from the absence of factual

 findings that in fact, Mr. Lennane did not have good cause to leave his employment

 because he refused to leave North Carolina for Spartanburg, South Carolina or

 Knoxville, Tennessee and did not take additional Family and Medical Leave. These

 are all, in essence, arguments that he did not have good cause to leave his

 employment.
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

¶ 29 The appeals referee’s factual findings here do not suggest that ADT offered Mr.

 Lennane service calls that would comply with his medical restrictions at the time

 rather than installation work. Based on the findings of fact, “[t]he claimant’s manager

 denied the claimant’s request [only to be assigned service rather than installation

 calls] because he needed to keep a fair balance of work distribution among all of the

 service technicians.” In these circumstances, the decision not to offer Mr. Lennane

 work that he could perform safely is what led to the good cause for his need to stop

 working. Mr. Lennane carried his burden of demonstrating that the good cause for

 his leaving was attributable to a decision of the employer. He should not be

 disqualified from receiving unemployment benefits. Therefore, I dissent.

¶ 30 Although our task here is to determine whether the Division’s findings of fact

 support its legal conclusions, the majority begins with an examination of the public

 policy behind the General Assembly’s establishment of unemployment compensation.

 Ironically, the legislature’s declared policy actually supports the conclusion that ADT

 did not do enough here to keep Mr. Lennane on its payroll with work that he could

 safely perform given his health condition, rather than the majority’s conclusion that

 Mr. Lennane should have moved out of state to work in an administrative position or

 take unpaid leave. According to the 1936 statute, economic security in North Carolina

 is promoted by “encouraging employers to provide more stable employment.” N.C.G.S.

 § 96-2 (2021) (carrying forward the original statutory language). Moreover, “the
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 public good and the general welfare of the citizens of this State require . . . the

 compulsory setting aside of unemployment reserves to be used for the benefit of

 persons unemployed through no fault of their own.” Id. The statute is intended to

 protect North Carolina workers and to encourage employers to provide stable

 employment.

¶ 31 Whatever the policy implications, the more specific language of the statute’s

 disqualification provision applies here. See In re Steelman, 219 N.C. 306, 310-11,

 (1941) (the general designation of workers selected for benefits being those who are

 “unemployed through no fault of their own.” is constrained by the more specific

 provisions of the statute if the provisions would otherwise conflict). This Court has

 found that “sections of the act imposing disqualifications for its benefits should be

 strictly construed in favor of the claimant and should not be enlarged by implication

 or by adding to one such disqualifying provision words found only in another.” In re

 Watson, 273 N.C. 629, 639 (1968); see also Marlow v. N.C. Emp. Sec. Comm’n, 127

 N.C. App. 734, 735 (1997) (“Further, in keeping with the legislative policy to reduce

 the threat posed by unemployment to the ‘health, morals, and welfare of the people

 of this State,’ statutory provisions allowing disqualification from benefits must be

 strictly construed in favor of granting claims.” (quoting N.C.G.S. § 96-2 (1995)), disc.

 rev. denied, 347 N.C. 577 (1998); Lancaster v. Black Mountain Ctr., 72 N.C. App. 136,

 141 (1984) (same). It goes without saying that this Court should not be imposing new
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 disqualification rules that have no basis in the statute. See N.C.G.S. § 96-14.5.

¶ 32 ‘Good cause,’ which was conceded here, is understood to be “a reason which

 would be deemed by reasonable men and women valid and not indicative of an

 unwillingness to work.” Carolina Power & Light Co. v. Emp. Sec. Comm'n of N. C.,

 363 N.C. 562, 565 (2009) (quoting Intercraft Indus. Corp. v. Morrison, 305 N.C. 373,

 376 (1982)). Given that Mr. Lennane’s reason for resigning was for “good cause,” it is

 therefore clear that the facts do not support any conclusion that he resigned because

 he was unwilling to work. And yet, that is precisely what the majority ultimately

 concludes, that Mr. Lennane had “other choices” but chose not to keep working. The

 majority’s conclusion is not supported by the factual findings in this case.

¶ 33 If the separation is “produced, caused, created or as a result of actions by the

 employer,” it is attributable to the employer. Id. (quoting Couch v. N.C. Emp. Sec.

 Comm’n, 89 N.C. App. 408 at 409-10, aff’d per curiam, 323 N.C. 472 (1988)). Inaction

 by the employer also can provide good cause to leave a job. See, e.g., Ray v. Broyhill

 Furniture Indus., 81 N.C. App. 586, 592–93 (1986) (attributing a supervisor’s failure

 to put in a transfer request on behalf of an employee to a department with fewer

 health risks as one of the bases of good cause for the employee’s departure). Good

 cause is attributable to the employer where circumstances caused by the employer

 “make continued work logistically impractical” or “when the work or work

 environment itself is intolerable.” Carolina Power, 363 N.C. at 567–68.
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

¶ 34 Examples of good cause attributable to employers when they create

 circumstances that make work logistically impractical for the employee are

 instructive. In Barnes v. Singer Co., the employee quit after her employer relocated

 her job and she did not have reliable transportation to her new place of employment.

 324 N.C. 213, 214, 216–17 (1989). In Couch v. North Carolina Employment Security

 Commission, a woman who quit her job after her employer unilaterally and

 substantially reduced her working hours was not disqualified from receiving

 unemployment benefits. 89 N.C. App. 405, 412, aff’d per curiam, 323 N.C. 472 (1988).

 In Couch, the Court of Appeals remanded the case to determine whether the decrease

 of two hours per day of work was substantial enough to constitute good cause. Id. at

 408, 412–13. In Milliken & Co. v. Griffin, the Court of Appeals found good cause

 attributable to the employer when Ms. Griffin quit after her employer failed to heed

 her doctor’s advice that she receive work that did not aggravate her muscle spasms

 or be assigned shorter shift hours. 65 N.C. App. 492, 497 (1982), disc. rev. denied, 311

 N.C. 402 (1984). The Court of Appeals based its decision on the fact that Ms. Griffin

 spoke to her manager about her health issues and desire for alternative work options

 within the company, ultimately found none and then resigned. Id. at 495. None of

 these precedents are reversed by the Court’s decision in this case.

¶ 35 Instead, whether good cause attributable to the employer exists is a highly

 fact-specific determination, for which Mr. Lennane bears the burden of proof. The
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 fact to be decided here was not whether ADT or Mr. Lennane made the most effort to

 “preserve the employment relationship,” but rather, who was responsible for the

 circumstances that led to Mr. Lennane resigning for good cause. It is most important

 to remember that this is not a fault-based inquiry, ADT may have had a very good

 business reason for not allowing Mr. Lennane to work only service calls. But in this

 particular workplace, it was ADT’s decision to make, not Mr. Lennane’s.

¶ 36 As the factual findings explain, ADT had previously divided its home security

 system service and installation departments. Despite Mr. Lennane’s having been

 trained to do the more physically demanding job of installation work, he was still

 primarily a service technician. He had worked at this job for over six years by the

 time he quit, and four of those years were spent dealing with various knee injuries.

 The injury to his left knee happened while he was on the job, and despite undergoing

 knee surgery, he sustained a permanent partial disability in that knee. This injury

 and the subsequent limit on the full use of his left knee caused Mr. Lennane to favor

 his right knee, which led to him “experiencing regular pain in his right knee.”

¶ 37 As his pain increased, Mr. Lennane also experienced a reshuffling of his duties

 at work when a merger caused ADT to combine its service and installation

 departments. The loss of that structural divide required service technicians to do

 installation work as well. There was conflicting testimony at the hearing regarding

 how much of an increase in installation work this created for Mr. Lennane, and the
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 findings of fact do not resolve that question.1 But the appeals referee did find that

 Mr. Lennane “kept the employer informed of his physical health conditions” and that

 he “had difficulty performing installations due to the poor physical conditions of his

 knees, of which he notified his manager.” He asked about two less strenuous work

 options: a desk job or forgoing installation work. Neither option was a realistic choice

 for him because the administrative work was only available out of state and the

 manager “needed to keep a fair balance of work distribution among all of the service

 technicians.”

¶ 38 Mr. Lennane tried to continue with his job by taking a five-week FMLA leave

 of absence to heal, but that hiatus could not permanently fix the deterioration of his

 knees. His manager still would assign him installations while attempting to keep

 these jobs smaller or to assign a second service technician to assist him on large

 installations. Yet, these attempts were not enough because Mr. Lennane’s doctor

 recommended that he not walk or stand for long periods.

 1 In the absence of detailed findings of fact regarding the effect on Mr. Lennane of the

 change in work assignments from only service work to a mix of service and installation work,
 despite testimony on this point, the majority erroneously concludes that therefore Mr.
 Lennane failed to establish a causal nexus between ADT’s actions and his leaving work. Not
 only does this determination negate the concession that Mr. Lennane left for good cause, it
 also assumes that in the absence of factual findings, the employer’s version of events must
 be correct. Mr. Lennane did testify about the causal nexus between ADT’s inability to
 accommodate his need for limited walking and standing and his decision to resign. If there is
 testimony tending to prove a material fact but the absence of a related factual finding, it is
 not the role of this Court to make assumptions, draw contrary inferences, or make its own
 factual findings.
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

¶ 39 The findings of fact paint a vivid picture of someone who tried to hold on to his

 job despite chronic pain from a workplace injury, but who ultimately had good cause

 to leave. And the findings also present a picture of an employer that tried to

 accommodate his employees’ bad knees in some fashion but who, for business reasons,

 failed to do so adequately. Just as in Barnes, in which the court concluded that

 materially moving an employee’s job is good cause attributable to that employer,

 similarly here it should not be held against Mr. Lennane that ADT’s only

 administrative work option was outside of North Carolina and that his manager’s

 preference was to make an equal distribution of installation work among service

 technicians. ADT had less strenuous service work still available at Mr. Lennane’s

 North Carolina location but chose not to let him focus only on that work. Given that

 the majority does not purport to overrule Barnes, but inexplicably decides not to rely

 on it, the principle established by this Court in Barnes remains good law, namely

 that: “[a]n employee does not leave work voluntarily when the termination is caused

 by events beyond the employee's control or when the acts of the employer caused the

 termination.” Barnes, 324 N.C. at 216. There, an employer moving a plant eleven

 miles away to a location the employee could not commute to from her home,

 constituted good cause attributable to the employer. Id. In this case, requiring that

 Mr. Lennane move out of state to maintain employment that does not further damage

 his health similarly is holding him responsible for matters beyond his control. The
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 application of the law here is not about sympathy for an injured worker, it requires

 an analysis of whether the good cause, conceded by respondent, was due to factors

 within the employer’s control.

¶ 40 Ultimately, Mr. Lennane’s manager decided not to meet his medical needs by

 assigning only service work and, just as the employee in Ray, Mr. Lennane chose his

 health and had to quit. Unlike the situation in Ray, however, Mr. Lennane did pursue

 several avenues to try to keep his job. All of the steps taken by Mr. Lennane – keeping

 his employer informed of his health problems, requesting a transfer to office work,

 taking FMLA leave, and asking for lighter field assignments – show an employee

 trying to keep working. Indeed, Mr. Lennane’s pursuit of reasonable remedial

 measures exceeded the efforts to preserve employment undertaken by employee Ray,

 who did not take FMLA leave. More importantly, as the unanimous court in Ray

 pointed out, “[s]peculation as to what [claimant] could have done” is irrelevant. Ray,

 81 N.C. App. at 592. (emphasis in original).

¶ 41 Mr. Lennane was in an even more compelling circumstance than the successful

 claimant in Ray. Mr. Lennane acquired his underlying health problems on the job.

 The findings of fact make clear that his health concerns arose from job requirements

 that had changed since his hire, even if the magnitude of that change is not specified.

 Mr. Lennane was a “person who must quit a job for health reasons but who is

 available for other employment,” and therefore, “reason and justice demand that such
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

a claimant receive unemployment benefits.” Griffin, 65 N.C. App. at 497. Indeed, the

logic of the Court of Appeals’ decision in Griffin is compelling here, because in that

case the very policy cited by the majority here was the basis of the Court of Appeals’

conclusion that an employee whose health condition leads to unemployment is

entitled to receive unemployment benefits:

 Milliken would have us follow those jurisdictions
 which have denied benefits to individuals who became
 unemployed because of sickness, accident or old age. . . . We
 find that the language in the Mills decision is in conflict
 with the policy behind North Carolina’s Employment
 Security Act and application of the Act. The Mills court
 concluded that “involuntary unemployment” under the Act
 meant unemployment resulting from a failure of industry
 to provide stable employment; and that unemployment due
 to changes in personal conditions to the employee, which
 made it impossible for him to continue his job, was not the
 type covered by the Act. Our Legislature did not intend
 such a narrow application of the Act when it declared the
 following public policy to be accomplished by the Act: “[T]he
 public good and the general welfare of the citizens of this
 State require the enactment of this measure . . . for the
 compulsory setting aside of unemployment reserves to be
 used for the benefit of persons unemployed through no
 fault of their own.” G.S. § 96-2.

Id., at 497-98 (second and third alternations in original) (internal citations omitted).

Both Ray and Griffin remain good law. The majority does not dispute the logic or

reasoning of either decision. Instead, the majority finds a significant distinction that

in Ray the employer “did not act to preserve the employment relationship” because

Ray’s supervisor denied a transfer request and refused to provide a protective mask.
 IN RE LENNANE

 2022-NCSC-21

 Earls, J., dissenting.

 Even if denying a transfer request differs significantly from offering a transfer that

 requires moving out of state while denying limited work assignments at the current

 worksite, the ultimate question is who has created the condition under which

 continued employment is not possible. Based on the factual findings in this case, the

 relevant business decisions were made by ADT. Mr. Lennane wanted to work, he just

 could not continue to put too much strain on his knees by installing security systems.

¶ 42 The majority also goes beyond the findings of fact in assuming that Mr.

 Lennane could have continued to perform installation work for ADT so long as he

 periodically took FMLA leave to rest his knees. While there was some testimony in

 the record from Mr. Lennane concerning how frequently he already was resting his

 knees to no lasting effect, the assumption made by the majority is not in the appeals

 referee’s findings of fact. We do not know from this record whether such leave would

 have been paid or unpaid, or even if it would have addressed the medical problem.

 On the record before us, Mr. Lennane left his job for good cause, namely, personal

 health or medical reasons, in circumstances in which his employer did have work that

 he could have performed, specifically service calls rather than installation work, but

 chose not to give him the option of doing that work. Mr. Lennane’s good cause for

 leaving work was attributable to ADT, and he should not be disqualified from

 receiving unemployment benefits.

 Justices HUDSON and ERVIN join in this dissenting opinion.